IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. **96-7214**

**CIV-LENARD**

TOM CHERNOFF and
WHITEROCK, INC., a Florida
corporation

    Plaintiffs

vs.

NATIONAL SAFETY ASSOCIATES, INC.,
a Tennessee corporation

    Defendant

_____/

MAGISTRATE JUDGE
BANDSTRA

NIGHT BOX
FILED

OCT 2 2 1996

CARLOS JUENKE
CLERK, USDC / SDFL / FTL

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Tom Chernoff and Whiterock, Inc. (collectively referred to as "Plaintiffs"), through their undersigned counsel, sue Defendant, National Safety Associates, Inc. (hereinafter "NSA") and alleges:

### GENERAL ALLEGATIONS COMMON TO ALL COUNTS

1.    Plaintiff, Tom Chernoff, is a citizen of the State of Florida and Plaintiff, Whiterock Inc., is a corporation incorporated under the laws of the State of Florida having its principal place of business in the State of Florida. Defendant, NSA, is a corporation incorporated under the laws of the State of Tennessee having its principal place of business in a State other than the State of Florida. The matter in controversy exceeds, exclusive of interest and costs, the sum of fifty thousand dollars ($50,000.00).

2.    At all times material hereto, Plaintiff, Tom Chernoff, is an individual over the age of eighteen and was a resident of Broward County, Florida.



3.     At all times material hereto, Whiterock Inc. was a Florida corporation with its principal place of business in Broward County, Florida.

4.     At all times material hereto, NSA was a Tennessee corporation with its principal place of business in Tennessee.

5.     At all times material hereto, NSA was engaged in substantial and not isolated activity in Florida, therefore subjecting itself to the jurisdiction of the Florida courts under Fla. Stat. § 48.193 (2). That activity included the shipment of products into Florida, entering into contracts in Florida, making payments to distributors and collecting monies in Florida.

6.     Alternatively, NSA operated, conducted, engaged in, or carried on a business or business venture in Florida and/or breached a contract in Florida, therefore subjecting itself to jurisdiction in Florida under Fla. Stat. § 48.193 (1)(a) and (g).

7.     Plaintiffs have retained the law firm of Ullman & Ullman, P.A. to represent them in connection with this action and have agreed to pay Ullman & Ullman, P.A. for its services.

8.     Tom Chernoff and Whiterock Inc. have performed any necessary conditions precedent, or the same have occurred, been waived, or been excused.

9.     Plaintiffs demand trial by jury on all issues so triable.

## COUNT 1

### Breach of Contract

10.    NSA distributes air and water filtration systems and other products.

11.    NSA developed a marketing program for the distribution of NSA products. The system is a multi-level marketing program developed to facilitate and promote the sale of its

2

products through what are referred to as independent dealers/distributors ("dealer/distributors").

12.     In 1989, NSA organized National Safety Associates International, Inc. ("NSA International") as its subsidiary.

13.     In 1990, NSA transferred the shares of NSA International to its individual shareholders and NSA International became an affiliate of NSA.

14.     NSA International manufactures air and water infiltration systems and other products.

15.     NSA International distributes those products through its direct selling subsidiaries, National Safety Associates, Ltd., a Canadian corporation, National Safety Associates of America (U.K.) Limited, a United Kingdom corporation, NSA GmbH Oko Filter Systeme, a German corporation, and NSA International de Mexico, S.A. de C.V., a Mexican corporation ("Direct Selling subsidiaries").

16.     NSA International also sells products to NSA which are distributed by NSA throughout the United States.

17.     At all times material hereto, NSA International and the Direct selling subsidiaries utilized the multi-level marketing program developed by NSA for distribution of NSA and NSA International products.

18.     At all times material hereto, pursuant to a written management agreement, NSA provided management, consulting and advisory services to NSA International and its Direct selling subsidiaries relating to accounting, data processing, legal and regulatory compliance,

general management, administration of benefits, contract and lease negotiations and other such matters for which NSA International and/or its Direct selling subsidiaries requested assistance.

19. At all times material hereto, in the central computer system at NSA'S Memphis office, NSA maintained information regarding all dealers/distributors for NSA, NSA International and its Direct selling subsidiaries, product orders placed by all dealer/distributors, and commissions, performance bonuses and/or rebates paid and payable to all dealers/distributors.

20. At all times material hereto, NSA also utilized NSA'S computer system to monitor compliance with the Rules regarding changes of sponsorship for all NSA's, NSA International's and the Direct selling subsidiaries' dealers/distributors.

21. Plaintiff Tom Chernoff and /or Whiterock, Inc. and NSA entered into a binding written contract on or about August, 1987.[1] A form of the contract entered into is attached hereto as Exhibit "A," since the actual contract signed by one or both of the parties is in the exclusive possession of NSA.

22. The contract was renewed according to its terms each year thereafter until 1994. The applications for renewal are also in the exclusive possession of NSA.

---

[1]Plaintiffs do not recall whether the contract was entered into in the corporate name or by Tom Chernoff in his individual capacity and have therefore alleged the Plaintiffs in the alternative. Upon receipt of a copy of the contract, Plaintiffs may dismiss the Plaintiff who was not a party to the contract if Plaintiffs determine that the Plaintiff not named in the contract is an unnecessary party to this litigation.

4

23.    Pursuant to the contract, Tom Chernoff and /or Whiterock, Inc. became an independent dealer/distributor for NSA.

24.    Incorporated in the terms of Plaintiffs' contract with NSA and each renewal thereof were NSA's Rules for operation of an NSA dealership. A copy of the applicable Rules (rev. 12/90) is attached hereto as Exhibit "B." Plaintiff does not have a copy of the Rules in effect in 1987, which are in the exclusive possession of NSA.

25.    Paragraph 13 of the Rules provided, among other things, that "Dealers who wish to change sponsors must wait at least twelve (12) months after resigning before doing so."

26.    Paragraph 16 of the Rules provided that "No individual Dealer may have an ownership interest in, operational or management control of, or derive any benefit directly or indirectly from, any second or subsequent NSA Dealership not in the same line of sponsorship as the individual's initial NSA business."

27.    The Rules also allowed for international sponsorship of dealers/distributors provided that "dealers[/distributors] only [sponsor other dealers/distributors] in countries in which NSA has registered to operate its business and must fully comply with the Rules for Operation of an NSA Dealership in that country." Rules of Operation at ¶15.

28.    The referenced Rules were incorporated into every dealer/distributor contract entered into by NSA , NSA International and/or the Direct selling subsidiaries, regardless of the jurisdiction where the dealer/distributor contract was entered into.

national marketing director - each of which had specific criteria to be met and bonuses, commissions, rebates and benefits which accompanied the level achieved.

33.    At all times material hereto, a dealer/distributor's entitlement to commissions, performance bonuses, rebates and/or other benefits and payments was determined monthly and depended upon performance criteria being met, among other things.

34.    NSA distributed said commissions, performance bonuses, and/or rebates on a monthly basis utilizing information from the central computer maintained in the Memphis, Tennessee office regarding orders placed by all dealers/distributors for NSA, NSA International and the Direct selling subsidiaries.

35.    The performance criteria upon which a dealer/distributor's entitlement to commissions, performance bonuses, rebates and/or other benefits and payments was determined was set forth in the Marketing Plan.

36.    The Marketing Plan was also incorporated into each contract.

37.    Inclusion of the Rules and the Marketing Plan in the NSA contracts created a contractual obligation upon NSA to enforce their terms and prohibit any changes of sponsorship not in compliance with the Rules.

38.    On November 4, 1990, Marcia Nish entered into a contract with National Safety Associates, Ltd. and became a sponsored dealer/distributor in Plaintiffs' "downline."  A copy of her sponsorship application is attached hereto as Exhibit "C."

39.    As a direct result of this contract and operation of the Marketing plan, all those in Ms. Nish's "upline," including Plaintiffs, became entitled, or potentially entitled, to

7

29.    At all times material hereto, through NSA'S marketing program, dealers/ distributors could sponsor others to become dealers/distributors.  NSA permitted sponsorship within any geographic area where an NSA company did business, regardless of where the sponsoring dealer/distributor was located.

30.    When NSA accepted an application of a new dealer/distributor, the new dealer/distributor became part of the "downline" of the sponsoring dealer/distributor and was entitled to purchase NSA products at wholesale prices for sale to the public and to sponsor new dealer/distributors.

31.    Existing dealers/distributors benefitted from the sponsorship of new dealers/distributors in that the sponsoring dealer/distributor received a percentage commission on the products purchased for resale by those personally-sponsored individuals, as well as a percentage commission on the products purchased by those dealers/distributors brought in by those personally sponsored.

32.    Subject to meeting established sales quotas, volumes, time parameters and/or performance levels, a dealer/distributor could receive:

a) commissions on sale of the products the dealer/distributor has sold;

b) commissions, performance rebates and/or rebates on sales orders placed by dealer/distributors in the "downline;"

c) other bonuses and/or benefits; and/or

d) promotion to a higher level of dealer/distributor, including direct distributor, senior direct distributor, sale coordinator, qualifying national marketing director and/or

6

commissions, performance bonuses and/or rebates based upon Ms. Nish's purchase of products, as well as those of others in her "downline."

40.    Ms. Nish's contract contained the same provisions regarding change of sponsorship and ownership or benefit from other NSA dealerships as contained in the Plaintiffs' contract.

41.    On or about October 23, 1991, Ms. Nish was permitted to transfer to a new sponsor without first resigning and waiting out the twelve month period as required by the Rules. A copy of Ms. Nish's new sponsorship application is attached hereto as Exhibit "D."

42.    Prior to the change in her sponsorship, Ms. Nish was an active participant in Plaintiffs' "downline" and was placing orders through which those in her "upline," including Plaintiffs, received a benefit.

43.    Plaintiffs had an interest in Ms. Nish's continued sales and success in the NSA program.

44.    NSA was aware of Ms. Nish's change of sponsorship and did nothing to prevent said change.

45.    Moreover, NSA stopped compensating Plaintiffs for commissions, performance bonuses and/or rebates to which they were entitled as a result of the purchase of products by Ms. Nish and those in her "downline."

46.    NSA'S failure to prevent the change and/or enforce the Rules and/or to compensate Plaintiffs for commissions, performance bonuses and/or rebates to which they were entitled constituted one or more breaches of the contract between NSA and Plaintiffs.

8

47.    As a result of the breach by NSA, Plaintiffs suffered damages, including but not limited to the loss of revenues from the purchase of products by Ms. Nish and those in her "downline."

48.    The Rules incorporated into the contract provided that "[i]n the event of a breach of these rules,...[e]ach Dealer must indemnify, defend and hold NSA and its affiliates harmless against any claims, costs and liability...including payment of reasonable attorneys' fees incurred by NSA."

49.    Pursuant to Fla Stat. §57.105 (2),  if Plaintiffs are the prevailing party herein, they would be entitled to receive an award of attorneys' fees.

**WHEREFORE**, Plaintiffs, Tom Chernoff and/or Whiterock Inc., demand judgment for damages against Defendant NSA, together with interest , costs, and attorney's fees.

## COUNT 2

### Breach of Contract

50.    Plaintiffs reallege and reaver paragraphs 1 through 9 and  21 through 24 as if fully set forth herein.

51.    The Rules, incorporated into Plaintiffs' contract, established criteria for the manner in which dealers/distributors could conduct their NSA business.  Those Rules provided, *inter alia*, as follows:

a) Dealers/distributors will at all times conduct themselves and their businesses in an ethical, moral, legal and financially sound manner, and will not engage in any activities

9

which would bring disrepute on the good name or image of NSA, its products or other dealers/distributors. ¶2 of the Rules;

b) Dealers/distributors may only use current NSA literature and may not use privately produced literature. ¶11 a of the Rules;

c) Dealers/distributors may not make any representations that are not entirely within the claims set forth in NSA's literature; ¶11b of the Rules;

d) NSA will not approve the use of its logo in any broadcast, newspaper, magazine or similar media advertising. ¶11c of the Rules;

e) Any income representations made must be factual and may not imply that the level or amount of income is easy to achieve; ¶11d of the Rules;

f) All representations must comply with applicable law; ¶11e of the Rules;. and

g) When describing the NSA program, dealers/distributors must present the program in its entirety with material omissions, distortions or misrepresentations. .¶11i of the Rules.

52.    The Rules further provided that "[i]n the event of any breach of the rules, NSA shall have the right to terminate the breaching Dealer's [/distributor's] Dealership..." ¶12 of the Rules.

53.    The Rules did not prohibit dealers/distributors from pursuing other business opportunities.

10

54.     On or about October 2, 1994, NSA terminated Plaintiffs' distributorship purportedly based upon its belief that Plaintiffs were "soliciting NSA distributors, both directly and indirectly, " into a new venture. A copy of the letter of termination is attached hereto as Exhibit "E."

55.     At no time prior to the termination had Plaintiffs violated any of the established Rules for an NSA dealership.

56.     NSA breached its contract with Plaintiffs as a result of its wrongful termination of the Plaintiffs' distributorship.

57.     As a result of NSA's breach, Plaintiffs have suffered damages, including loss of revenue from their own sales, as well as commissions, performance  bonuses and/or rebates from the purchase of products by others in their "downline."

58.     The Rules incorporated into the contract provides that "[i]n the event of a breach of these rules,...[e]ach  Dealer must indemnify, defend and hold NSA and its affiliates harmless against any claims, costs and liability...including payment of reasonable attorneys' fees incurred by NSA."

59.     Pursuant to Fla Stat. §57.105 (2),  if Plaintiffs are the prevailing party herein, they would be entitled to receive an award of attorneys' fees.

        **WHEREFORE**, Plaintiffs, Tom Chernoff and/or Whiterock Inc., demand judgment for damages against Defendant NSA, together with interest, costs, and attorney's fees.

## COUNT 3

### Action for Accounting

60.    Plaintiffs readopt and reallege the allegations contained in paragraph 1 through 9, 21 through 24 and 29 through 36 as if fully set forth herein.

61.    As a result of the contract between Plaintiffs and NSA, which incorporated by reference the Rules of operation of an NSA Dealership and the Marketing Plan, Plaintiffs were entitled to receive a percentage commission on the products purchased for resale by the dealers/distributors that the Plaintiffs sponsored as well as a percentage commission on the products purchased by dealers/distributors in the Plaintiffs' "downline."

62.    Plaintiffs' entitlement to commissions', performance bonuses, rebates and/or other benefits and payments was determined monthly and depended upon performance criteria being met.

63.    NSA distributed said commissions, performance bonuses, and/or rebates on a monthly basis utilizing information from the central computer maintained in the Memphis, Tennessee office regarding orders placed by all dealers/distributors for NSA, NSA International and the Direct selling subsidiaries.

64.    As of October, 1991, NSA has wrongfully failed and refused to distribute said commissions, performance bonuses and/or rebates based upon the purchase of products by Ms. Nish and those in her "downline" and has failed to give Plaintiffs an accurate accounting of the commissions, performance bonuses and/or rebates that Plaintiffs earned as a result of that "downline."

12

65. NSA has also wrongfully failed and refused to distribute commissions, performance bonuses and/or rebates to Plaintiffs as a result of the activities of those in their "downline" as of October, 1994 and has failed to give Plaintiffs an accurate accounting of the commissions, performance bonuses and/or rebates that Plaintiffs earned as a result of that "downline."

66. Because the commissions, performance bonuses and/or rebates are determined on a monthly basis and are based upon information solely within the possession of NSA, Plaintiffs are unable to approximate the amount of products purchased for resale by the dealers/distributors in Plaintiffs' "downline" and/or the sum of money that NSA presently owes Plaintiffs.

67. Plaintiffs have been unable to obtain a definite and final list of the commissions, performance bonuses and/or rebates to which it is entitled. The subject transactions are of such an extensive, voluminous nature that they become extremely complicated, to the extent that the Plaintiffs are entitled to a full and complete accounting.

68. Because of the number of transactions, both known and unknown, that are in dispute, the time period over which they occurred and Plaintiffs' lack of adequate written records of the transactions, Plaintiffs' remedy at law is inadequate and will not be as expeditious as it is in equity.

**WHEREFORE**, Plaintiffs, Tom Chernoff and/or Whiterock Inc., demand an accounting and thereafter the entry of a final judgment against the Defendant, NSA, for damages for all

13

sums that the accounting reveals are due, owing and unpaid, and for such other and further relief as this court deems appropriate, including costs and attorneys' fees.

## COUNT 4

### Action for Declaratory Relief
### (Continuity of Downline)

69.    Plaintiffs reallege and reaver paragraphs 1 through 9 and 21 through 36 as if fully set forth herein.

70.    This is an action for declaratory judgment pursuant to 28 U.S.C. §§2201 and 2202.

71.    A controversy has arisen between the Plaintiffs and NSA as a result of which Plaintiffs are in doubt as to their rights and status under the contract entered into in August 1987 and renewed thereafter until 1994.

72.    The controversy arises over the Rule contained in NSA Rules for operation of an NSA dealership that requires that "Dealers[/distributors] who wish to change sponsors must wait at least twelve (12) months after resigning before doing so."

73.    The contract and related documents did not define the effect of a dealer/distributor's resignation upon its "downline" at the time of its resignation.

74.    The contract and related documents did not define the effect of a dealer/distributor's resignation on its "downline" during the one year period during which the resigning dealer/distributor must remain inactive.

14

75. The contract and related documents did not define the effect on the "downline" of a dealer/distributor who waited out the required twelve (12) month period before changing sponsors.

76. Because the Marketing Plan implemented by NSA provided that dealers/distributors benefit from the activities of those in their "downline," Plaintiffs contend that the resignation and/or change of sponsorship of a remaining dealer/distributor in their "downline" should have no impact on those dealer/distributors sponsored by the resigning dealer/distributor and/or any others in the "downline."

WHEREFORE, Plaintiffs, Tom Chernoff and/or Whiterock Inc., pray that this court:

a. Enter an order declaring that the contract and related documents require that the resignation and/or change of sponsorship of a dealer/distributor in Plaintiffs' "downline" does not have the effect of transferring the remaining dealers/distributors from Plaintiff's downline; and

b. To enter an order providing for such other and further relief that this court deems just and proper.

## COUNT 5

### Declaratory relief
### (NSA'S Duties to Enforce Rules of Operation)

77. Plaintiff reallege and reaver paragraphs 1 through 9 and 21 through 46 as if fully set forth herein.

78. This is an action for declaratory relief pursuant to 28 U.S.C. § §2201 and 2202.

15

79.     A controversy has arisen between Plaintiffs and NSA as a result of which Plaintiffs are in doubt as to their rights and status under the contract entered into with NSA.

80.     The controversy arose after Marsha Nish, an NSA dealer/distributor, was allowed to change sponsors without waiting out the requisite twelve (12) month period set forth in NSA'S Rules of operation.

81.     NSA has asserted that because Marsha Nish's dealer/distributor contract was with an NSA affiliate and not NSA that it did not have an obligation and/or duty to Plaintiffs to prevent Ms. Nish's transfer and/or to enforce the Rules regarding the twelve (12) month waiting period before a transfer or change of sponsorship could take place.

82.     NSA's asserted position with regard to Ms. Nish's change of sponsorship is contrary to the position that it has asserted other instances.

83.     Moreover, NSA had the sole responsibility for maintaining computer records regarding uplines and downlines and the identities of dealers/distributors for all NSA companies.

84.     Further, NSA assumed the responsibility for ensuring compliance with the Rules restricting changes of sponsorship for all dealers/distributors for all NSA companies.

WHEREFORE, the Plaintiffs, Tom Chernoff and/or Whiterock Inc., pray that this court:

a.     Entering an order declaring that NSA is obligated to require compliance with the Rules of operation by all dealers/distributors for all the NSA companies regardless of whether or not the dealer/distributor has directly contracted with NSA;

16

b.     Enter an order declaring that NSA breached its contractual obligation to

Plaintiff by failing to require compliance by Marsh Nish, NSA International and/or National

Safety Associates Ltd. with the Rules for operation of an NSA dealership; and

c.     Enter an order providing for such other and further relief as this court

deems just and proper.

ULLMAN & ULLMAN, P.A.
Attorneys for Tom Chernoff
and Whiterock Inc.
515 East Las Olas Boulevard
Suite 1350
Fort Lauderdale, FL 33301
Tel: (954)  462-5900
Fax: (954) 527-0609

By:

MICHAEL W. ULLMAN
Florida Bar Number 259667

By:

KATHLEEN/J. COOPER
Florida Bar Number 727199

2:960092.cpt

17

# ADDITIONAL

# ATTACHMENTS

# <u>NOT</u>

# SCANNED

## PLEASE REFER TO COURT FILE

JS 44
(Rev 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS

Tom Chernoff and
Whiterock, Inc. a Florida corporation

**96-7214**

**DEFENDANTS**

National Safety Associates, Inc.
a Tennesse corporation

**CIV-LENARD**

**MAGISTRATE JUDGE
BANDSTRA**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

Broward

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Ullman & Ullman, P.A.
515 E. Las Olas Blvd., #1350
Ft. Lauderdale, FL 33310  (954) 462-5900

ATTORNEYS (IF KNOWN)

**NIGHT BOX
FILED**

OCT 22 1996

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

CLERK, USDC / SDFL

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government
  Plaintiff
- ☐ 2 U.S. Government
  Defendant
- ☐ 3 Federal Question
  (U.S. Government Not a Party)
- ☒ 4 Diversity
  (Indicate Citizenship of
  Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
(For Diversity Cases Only) FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒1 | ☐1 | Incorporated or Principal Place of Business in This State | ☒4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☒5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

A No. 0:96cr7214-Lenard-Mag-Bandstra

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 USC Section 1332, Breach of contract, action
for accounting and declaratory relief pursuant to 28 USC Section 2201 & 2202

IVa. 8-10 days estimated (for both sides) to try entire case.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| A CONTRACT | TORTS | | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury — Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | PERSONAL PROPERTY | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | SOCIAL SECURITY | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | B ☐ 371 Truth in Lending | A LABOR | B ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | B ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| A REAL PROPERTY | A CIVIL RIGHTS | B PRISONER PETITIONS | | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | B ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ★ ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ★ A or |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ★ A or | | | |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Refiled
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE ____  DOCKET NUMBER ____

DATE
10/22/96

SIGNATURE OF ATTORNEY OF RECORD
Kathleen Korpel

FOR OFFICE USE ONLY: Receipt No. 510389  Amount: $120.00

Date Paid: 10-23-96  M/ifp:

UNITED STATES DISTRICT COURT
S/F I-2
REV. 6/90